# IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF VIRGINIA

### Alexandria Division

Na'im Q. Muhammad,              )
    Plaintiff,                  )
                               )

v.                             )       1:09cv939 (GBL/IDD)
                               )

Sheriff Michael Wade, et al.,   )
    Defendants.               )

## MEMORANDUM OPINION

Na'im Q. Muhammad, a Virginia inmate proceeding pro se, has filed a civil rights action pursuant to 42 U.S.C. § 1983, asserting that defendants violated his constitutional rights under the First Amendment both directly and through deliberate indifference. By Order dated March 3, 2010, defendants Bruce, Harper, Green, Callahan, McDonnell, and Fisher were dismissed as defendants for failure to state a claim pursuant to 28 U.S.C. § 1915A(b)(1). Now before the Court are defendants L. Bullock, Michael Wade, and S. Wilson's joint Motion to Dismiss (Docket # 26) and Memorandum in Support (Docket # 27), as well as defendant D. Dailey's Motion to Dismiss (Docket # 43) and Memorandum in Support (Docket # 44). In both motions, defendants argue that they are entitled to either absolute immunity under the Eleventh Amendment or at least qualified immunity, and that Muhammad's claims are without merit. Muhammad was given the opportunity to file responsive materials, pursuant to Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975), and has filed a response, indicating that he also intends to assert that his rights under the Religious Land Use and Institutionalized Persons Act (RLUIPA), 42 U.S.C. §§ 2200cc et seq., have been violated. For the reasons that follow, defendants' Motions to Dismiss will be granted.

## I. Background

All events described in the complaint occurred while Muhammad was confined in Henrico Regional Jail (HRJ). Muhammad states that Eid-ul-Fitr Prayer and Feast are major tenets of his religion, and explains that the information he received from the Islamic Center of Virginia, a copy of which he has provided, see Letter 25-26, ECF No. 22-1, "entails all the necessary/essential prerequisites for our fast and Eid prayers and celebrations." See Compl. 3, ECF No. 1; Am. Compl. 6, ECF No. 8. Muhammad's complaint focuses on the numerous instances in which he argues his rights under the First Amendment and RLUIPA were violated, all of which he has allegedly grieved through the prison's administrative grievance system. See Am. Compl. 8, ECF No. 8.

Muhammad's claims arise from what he views as defendants' failure to make appropriate accommodations to grant his numerous requests relating to his religious practices. Muhammad explains that his efforts to set up for a Ta'leem service were delayed by Deputy L. Bullock on August 23, 2008. See Am. Compl. 8, ECF No. 8. Muhammad was also "demeaned and degraded" by defendant Dailey in the presence of Callaham and Purches on August 28, 2010. See id. Additionally, Jumah service was cancelled on September 19, 2009 because there were vehicles on the boulevard. See Am. Compl.12, ECF No. 8.

Muhammad submitted a Ramadan/Eid-ul-Fitr proposal and an official Ramadan and Eid Communique from the Islamic Center of Virginia to Chaplain R. Jenkins and Lieutenant Green of Jail Services, which he later discussed with Chaplain R. Jenkins, Sergeant W. Callaham, and defendant Captain D. Dailey. See Am. Compl. 4, ECF No. 8; Compl. 3, ECF No. 1. Dailey allegedly denied the request for Eid-ul-Fitr Feast due to an order from Sheriff M. Wade, see Compl. 3, ECF No. 1, and R. Jenkins denied the bag meal. See Am. Compl. 7, ECF No. 8.

Muhammad allegedly discussed the importance of Eid-ul-Fitr Prayer and Feast with Chaplain W. Fisher, and tried to arrange for the meal's preparation with Mr. L. Thomas, Lieutenant Green, Chaplain R. Jenkins, and Captain D. Dailey. See Am. Compl. 5, ECF No. 8. Muhammad also spoke with Dailey about the possibility of extending religious class time. See Am. Compl. 5, ECF No. 8.

On September 2, 2008, Muhammad met with defendant Dailey to discuss his request to ensure that sufficient time was given for prayer during scheduled meeting times, as well as his concerns over the plan to have inmates fasting during RamFitrn sit in the dining hall during meal time because it "would be too much temptation for beginners." See Am. Compl.10-11, ECF No. 8. Dailey allegedly "threatened to have [Muhammad] observe Ramadan in special housing-segregation." See Am. Compl.10, ECF No. 8. At another time, Defendant Dailey allegedly interrupted a Jumah service to announce that there would not be an Eid-ul-Fitr feast, double portion dinner meal, or bag meal, and she also told the inmates that Muhammad was "making things difficult." See Am. Compl.9, ECF No. 8. Muhammad states that he celebrated Eid-ul-Fitr Prayer without a feast on October 1, 2008. See Compl. 3, ECF No. 1. He complained to Sheriff M. Wade about the denial of the feast, then was again permitted to have Eid-uh-Fitre Prayer but no feast on December 8, 2008. See Compl. 3, ECF No. 1. Additionally, Muhammad explains that there were not always enough of the meals that were provided to inmates who were participating in Ramadan, and some of the meals were missing items. See Am. Compl.9, ECF No. 8.

On November 4, 2008, Muhammad spoke to Sheriff M. Wade and asked if he was aware that inmates would not be given an Eid-ul-Fitr feast. See Am. Compl.11, ECF No. 8. Wade asked who denied the feast and said he would "look into these matters." See Am. Compl.11,

ECF No. 8. On another occasion when Muhammad was speaking to Wade about his concerns, Deputy S. Wilson "eavesdroppe[d]" on the conversation (which occurred in the open gym area), then told Muhammad "if [he] ever approach[ed] the sheriff again without permission, [Wilson] would have [him] locked up in Special Housing." See Am. Compl.12, ECF No. 8.

Muhammad submitted a reminder of the Eid-ul-Fitr prayer and feast to be held on December 8, 2008. See Am. Compl.12, ECF No. 8. Deputy Davis informed him that there would not be a feast. See Am. Compl.12, ECF No. 8. As expected, Eid-ul-Fitr prayer was held without a feast on December 8. See Am. Compl.13, ECF No. 8. Muhammad met with Chief Deputy C. Talley to discuss the Eid-ul-Fitr feast and the administrative grievance procedure. See Am. Compl.14, ECF No. 8. On April 27, 2009, Muhammad received a response stating that Captain Dailey and Captain Harper had disapproved the Eid-ul-Fitr feast. See Am. Compl.16, ECF No. 8.

On February 2, 2009, Muhammad received a disciplinary infraction from Deputy S. Wilson for interfering with security. See Am. Compl.13, ECF No. 8. Wilson had given Muhammad approval to use a vacant classroom to perform prayer. See Am. Compl.13, ECF No. 8. Muhammad asked Chaplain W. Fisher to open a closet to get a prayer rug. See Am. Compl.13, ECF No. 8. Wilson returned to the area, asked Muhammad how he got the rug, and charged him with interfering with security. See Am. Compl.13, ECF No. 8; see also Letter 55, ECF No. 22-1 ("I [Wilson] am charging I/M Muhammad with Interfering with Security Operations as I had to stop my duties to address the situation he caused."). This charge was reduced to disruptive behavior. See Letter 47, ECF No. 22-1.

Muhammad attempted to send materials to Uncommon Law Practice in California regarding representation. See Am. Compl.15, ECF No. 8. Although money was deducted from

his inmate account, he was told that Uncommon Law Practice never received the materials. See Am. Compl.15, ECF No. 8.

On April 29, 2009, Muhammad was transferred to Powhatan Correctional Center. See Am. Compl.16, ECF No. 8. He was then placed in segregation at Wallens Ridge State Prison. See Am. Compl.17, ECF No. 8.

Muhammad explains that his grievances have not been answered. However, he has provided numerous responses from prison officials, which indicate that the prison would not provide an Eid-ul-Fitr feast because "we [the prison] cannot allow feast for [Muhammad's] religion and not other religions." See, e.g., See Letter 61, ECF No. 22-1. Muhammad argues that his First Amendment rights have been violated, and he wishes to make a claim of deliberate indifference. See Am. Compl.17, ECF No. 8.

## II. Standard of Review

Rule 12(b)(6) allows a court to dismiss those allegations which fail "to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). When determining whether a motion to dismiss should be granted, the alleged facts are presumed true and the complaint should be dismissed only when "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." Hishon v. King & Spalding, 467 U.S. 69, 73 (1984). To survive a 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. ----, ----, 129 S. Ct. 1937, 1949 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. However, "[t]hreadbare recitals of the elements of a cause of action, supported by mere

conclusory statements, do not suffice" to meet this standard, id., and a plaintiff's "[f]actual allegations must be enough to raise a right to relief above the speculative level...". Twombly, 550 U.S. at 55. Moreover, a court "is not bound to accept as true a legal conclusion couched as a factual allegation." Iqbal, 129 S. Ct. at 1949-1950.

Courts may also consider exhibits attached to the complaint. United States ex rel. Constructors, Inc. v. Gulf Ins. Co., 313 F. Supp. 2d 593, 596 (E.D. Va. 2004) (citing 5A Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1357, at 299 (2d ed.1990), cited with approval in Anheuser-Busch v. Schmoke, 63 F.3d 1305, 1312 (4th Cir.1995)). Moreover, where a conflict exists between "the bare allegations of the complaint and any attached exhibit, the exhibit prevails." Gulf Ins. Co., 313 F. Supp. 2d. at 596 (citing Fayetteville Investors v. Commercial Builders, Inc., 936 F.2d 1462, 1465 (4th Cir.1991)).

### III. Analysis

In their Motions to Dismiss, defendants argue that they can have no liability to plaintiff on the basis of respondant superior and that they are entitled to absolute immunity under the Eleventh Amendment, or at least qualified immunity. Defendants further argue that Muhammad is not entitled to relief because he has failed to show that the defendants' actions were a "substantial burden" on his religious beliefs, or otherwise violated his federal rights. For the reasons that follow, the Motions to Dismiss will be granted.

### A. Defendant Dailey "Demeaned and Degraded" Muhammad

Muhammad appears to allege that when defendant Dailey "demeaned and degraded" Muhammad in front of others, it amounted to harassing and threatening verbal abuse in violation of the Eighth Amendment. Muhammad, however, has simply failed to allege anything

approaching such a violation. Verbal abuse of inmates by prison officials, without more, does

not rise to the level of an Eighth Amendment violation. See Collins v. Cundy, 603 F.2d 825, 827

(10th Cir. 1979), cited favorably in Moody v. Grove, 885 F.2d 865 (4th Cir. 1989) (table)

(unpublished). A verbal threat combined with action apparently designed to carry out the threat,

however, may state an Eighth Amendment claim. See Hudspeth v. Figgins, 584 F.2d 1345, 1348

(4th Cir. 1978). Muhammad has alleged neither that Dailey's comments amounted to a threat nor

that these comments were connected with any physical harm by Dailey or any other prison

official. Therefore, he has failed to state a claim of verbal abuse and this claim must be

dismissed.


## B. Defendant Sheriff Michael Wade is Entitled to Absolute Immunity

It is apparent that defendant Sheriff Michael Wade could have no liability to Muhammad

for the harm he asserts. Muhammad makes no allegations that Wade acted personally to deprive

him of his constitutional rights, so it appears clear that he was named as a defendant in this action

solely on the basis of his supervisory position. It is true that, in limited circumstances,

supervisory officials may be held liable for constitutional injuries inflicted by their subordinates.

See Shaw v. Stroud, 13 F.3d 791, 798 (4th Cir. 1994) (citing Slakan v. Porter, 737 F.2d 368 (4th

Cir. 1984)). However, this liability is not premised on respondeat superior, but rather upon "a

recognition that supervisory indifference or tacit authorization of subordinates misconduct may

be a causative factor in the constitutional injuries they inflict on those committed to their care."

Id. at 798 (quoting Slakan, 737 F.2d at 372-73). "[L]iability ultimately is determined 'by

pinpointing the persons in the decisionmaking chain whose deliberate indifference permitted the

constitutional abuses to continue unchecked.'" Id. at 798 (quoting Slakan, 737 F.2d at 376). In

order to establish supervisory liability under § 1983, a plaintiff must demonstrate:

> (1) that the supervisor had actual or constructive knowledge that his subordinate
> was engaged in conduct that posed "a pervasive and unreasonable risk" of
> constitutional injury to citizens like the plaintiff; (2) that the supervisor's response
> to that knowledge was so inadequate as to show "deliberate indifference to or tacit
> authorization of the alleged offensive practices,"; and (3) that there was an
> "affirmative causal link" between the supervisor's inaction and the particular
> constitutional injury suffered by the plaintiff.

Id. at 799 (citations omitted). In other words, a supervisory official can be liable under § 1983

for the conduct of his subordinates when the evidence shows that conduct directly causing the

deprivation was done to perpetuate an official policy or custom for which the official is

responsible. Fisher v. Washington Metro Transit Auth., 690 F.2d 1133, 1143 (4th Cir. 1982),

abrogated on other grounds, Co. of Riverside v. McLaughlin, 500 U.S. 44 (1991). Here,

Muhammad has come forward with no facts demonstrating that defendant Wade had actual or

constructive knowledge that his subordinates were engaged in conduct that violated

Muhammad's constitutional rights because Muhammad has failed to show that his rights were

violated. Therefore, defendant Wade's motion to dismiss will be granted because he can have no

vicarious liability to Muhammad for the harm he alleges.


## C. Muhammad's First Amendment Claim is Without Merit

Muhammad next argues that his rights were violated when defendants interfered with his

attempts to set up for classes and prayer, and when he was denied an Eid-ul-Fitr feast. The First

Amendment protects an individual's right to the free exercise of religion. U.S. Const. amend I.

Although incarcerated, a prisoner still "retains those First Amendment rights that are not

inconsistent with his status as a prisoner or with the legitimate penological objectives of the

corrections system." Pell v. Procunier, 417 U.S. 817, 822 (1974). To merit protection under the

Free Exercise Clause of the First Amendment, a plaintiff must satisfy two threshold criteria.

First, plaintiff must allege that his belief or beliefs are sincerely held. Wisconsin v. Yoder, 406

U.S. 205, 215-16 (1972). Second, plaintiff also must demonstrate that his claim is rooted in

"religious" and not "purely secular" philosophical concerns. Id.; see Thomas v. Review Bd. of

Indiana Employment Security Div., 450 U.S. 707, 713-14 (1981) ("Only beliefs rooted in

religion are protected by the Free Exercise Clause, which by its terms, gives special protection to

the exercise of religion."). To be recognized as religious, sincerely held beliefs need not be

"acceptable, logical, consistent, or comprehensive to others," Thomas, 450 U.S. at 714; based on

the existence of a supreme being or beings, see Torcaso v. Watkins, 367 U.S. 488, 495 & n. 11

(1961); Myers v. Loudon County Public Schools, 418 F.3d 395, 411 (4th Cir. 2005) (quoting

Torcaso, 367 U.S. at 495 n.11 for the proposition that the "Supreme Court has long recognized

that some religions practiced in this country 'do not teach what would generally be considered to

be a belief in the existence of God'"); or based in or on a mainstream faith. See Thomas, 450

U.S. at 714. Indeed, the Supreme Court held in the Establishment Clause case of McCreary

County, Ky. v. American Civil Liberties Union of Ky., 545 U.S. 844 (2005) that such beliefs may

be encompassed in the practice of atheism. In this case, there is no dispute that Muhammad is a

sincere adherent to the Islamic faith, and the Court therefore concludes that Muhammad's

religious beliefs are deserving of protection under the First Amendment.

However, inmates' constitutional rights must be evaluated within the context of their

incarceration. The Supreme Court has long recognized that "courts are ill equipped to deal with

the increasingly urgent problems of prison administration." Procunier v. Martinez, 416 U.S. 396,

405 (1974). "Running a prison is an inordinately difficult undertaking," and courts acknowledge

9

that the task of doing so is "peculiarly within the province of the legislative and executive branches of government." Turner v. Safley, 482 U.S. 78, 84 -85 (1987). Therefore, "courts must accord deference to the officials who run a prison, overseeing and coordinating its many aspects, including security, discipline, and general administration." Lovelace v. Lee, 472 F.3d 174, 200 (4th Cir.2006). The actions, even religiously motivated actions, of all citizens remain subject to regulation by the state government under its power to promote the health, safety, and general welfare of its citizens, so long as those regulations do not unduly burden the free exercise of religion, Yoder, 406 U.S. at 220, and a prisoner's federal constitutional rights, including his sincere desire to practice a religion, may be burdened upon a showing that the restriction is reasonably related to legitimate penological interests. O'Lone v. Estate of Shabazz, 482 U.S. 342, 349 (1987) (citing Turner, 482 U.S. at 89). In making such a determination, courts must consider:

> (1) whether there is a 'valid, rational connection' between the prison regulation or action and the interest asserted by the government, or whether this interest is 'so remote as to render the policy arbitrary or irrational'; (2) whether 'alternative means of exercising the right ... remain open to prison inmates,' an inquiry that asks broadly whether inmates were deprived of all forms of religious exercise or whether they were able to participate in other observances of their faith; (3) what impact the desired accommodation would have on security staff, inmates, and the allocation of prison resources; and (4) whether there exist any 'obvious easy alternatives' to the challenged regulation or action, which may suggest that it is 'not reasonable, but is [instead] an exaggerated response to prison concerns.'

Lovelace, 472 F.3d at 200 (quoting Turner, 482 U.S. at 89 - 92 (internal quotation marks and citations omitted)).

In this case, application of the foregoing criteria to the facts before the Court compels the conclusion that defendants' motions to dismiss must be granted. Muhammad has failed to

10

demonstrate that the defendants' decision to deny the Eid-ul-Fitr feast or manner of handling his requests for accommodations for his prayer and religious classes violated his First Amendment rights. As to the first Lovelace factor, HRJ's policy not to allow an Eid-ul-Fitr feast for one religion when no feasts are allowed for other religions is reasonably related to legitimate penological interests. There is a "valid, rational connection" between HRJ's policy not to allow special religious feasts, and the penological interest of controlling costs within the institution. Furthermore, the exhibits demonstrate that HRJ has allowed Muhammad extra time to set up for religious classes. See Letter 28, ECF No. 22-1. Finally, though Muhammad complains about the infraction he received for asking the Chaplain to open the closet to retrieve a prayer rug, even at the time of that incident, none of the defendants had interfered with his desire to pray. See Letter 55, ECF No. 22-1 ("Inmate Muhammad asked me if he could step in the [] Class room next to Duty 3 to pray for a few minutes due to him missing his prayer between lunch and class. I advised him that would be okay.").

As to the second Lovelace factor, it is apparent that HRJ's policy disallowing the Eid-ul-Fitr feast but allowing the Eid-ul-Fitr prayer and special meals at specified meal times during Ramadan did not prevent Muhammad from practicing his faith during his incarceration. Moreover, in Muhammad's descriptions of how the defendants caused delays in his preparation for class and prayer, he does not allege that he was actually denied the opportunity to hold class or prayer at any time.

Finally, as to the remaining two Lovelace criteria, HRJ's policy has not been shown to have had any negative impact on the institution's security staff, inmates, and resources. Moreover, there has not been any demonstration that there existed any "obvious easy

alternatives" to the decisions to deny the Eid-ul-Fitr feast but allow the Eid-ul-Fitr prayer and to the way the defendants handled Muhammad's requests related to religious classes and prayer. Therefore, it has not been shown that any of these decisions constituted "an exaggerated response to prison concerns." The Court thus concludes that the HRJ restrictions at issue in this case are reasonably related to legitimate penological interests. Lovelace, 472 F.3d at 200.

Moreover, the Court finds that the HRJ policy that allowed Muhammad to have Eid-ul-Fitr prayer but no Eid-ul-Fitr feast and that allowed Muhammad prayers and religious classes did not substantially burden plaintiff's First Amendment rights. In the context of the free exercise of religion, only those hardships that put "substantial pressure" on an adherent to change or to abandon his religious principles violate the Constitution. Lovelace, 472 F.3d at 200. Muhammad states that the Eid-ul-Fitr feast is an important tenet of his religion. However, at no point in the record does Muhammad claim that he felt substantial pressure to abandon or to change his devotion to these principles as the result of defendants' actions. Accordingly, there is no indication that Muhammad's inability to have an Eid-ul-Fitr feast or the inconveniences Muhammad experienced when preparing for religious classes and prayer substantially burdened his First Amendment rights, and the motions to dismiss will be granted.

## IV. Plaintiff's Reply

In his reply to the defendants' motions to dismiss, Muhammad appears to assert that his rights under RLUIPA were violated. In deference to Muhammad's pro se status, his reference to RLUIPA will be construed as a motion to amend his complaint to include a claim under RLUIPA. Because defendants filed their dispositive motions before Muhammad sought leave to amend, Muhammad's motion is governed by Fed. R. Civ. P. 15(a), which provides that once a defendant has filed a responsive pleading, plaintiff may amend his complaint only with leave of

court or by written consent of the defendant. Leave of court to amend "shall be given freely when

justice so requires." Id. The Supreme Court has elaborated on this standard as follows:

> In the absence of any apparent or declared reason - such as undue
> delay, bad faith or dilatory motive on behalf of the movant,
> repeated failure to cure deficiencies by amendments previously
> allowed, undue prejudice to the opposing party by virtue of
> allowance of the amendment, futility of amendment, etc. - the leave
> sought should ... be 'freely given.'

Foman v. Davis, 371 U.S. 178, 182 (1962). The Fourth Circuit interprets this directive to

provide that "leave to amend a pleading should be denied only when the amendment would be

prejudicial to the opposing party, there has been bad faith on the part of the moving party, or the

amendment would have been futile." Johnson v. Oroweat Foods Co., 785 F.2d 503, 509 (4th Cir.

1986) (citing Foman, 371 U.S. at 182). While it thus is apodictic that amendments to complaints

are to be freely allowed, particularly in the context of pro se litigation,[1] in this instance

Muhammad's proposed amendment to his complaint to assert a claim under RLUIPA would be

futile, and thus his motion to amend must be denied.

As noted above, Muhammad is no longer confined at RCJ, as he has been transferred to

the Wallens Ridge State Prison. See Letter/Change of Address 1, ECF No. 7. "[A]s a general

rule, a prisoner's transfer or release from a particular prison moots his claims for injunctive and

declaratory relief with respect to his incarceration there." Rendelman v. Rouse, 569 F.3d 182,

186 (4th Cir. 2009), quoting Incumaa v. Ozmint, 507 F.3d 281, 286-87 (4th Cir. 2007); Williams

v. Griffin, 952 F.2d 820, 823 (4th Cir. 1991). Therefore, at this juncture Muhammad can state no

claim under RLUIPA for injunctive relief as to HRJ's denial of Eid-ul-Fitr Feast.

---

[1]See, e.g., Gordon v. Leeke, 574 F.2d 1147, 1151 (4th Cir.), cert. denied, 439 U.S. 970 (1978) (holding that pro se civil rights plaintiff should be granted leave to amend despite failure to state how he could cure deficiencies).

Nor are monetary damages available to Muhammad under RLUIPA. Significantly,

RLUIPA does not waive states' Eleventh Amendment sovereign immunity from suit for

monetary damages, and hence Muhammad can have no claim for monetary damages against

defendants in their official capacities. See Madison v. Virginia, 474 F.3d 118, 131 (4th Cir.

2006) (holding in case where inmate sued under RLUIPA for deprivation of kosher meals that

the Eleventh Amendment barred his claim for monetary relief against the state). Moreover, the

Fourth Circuit has held that if jurisdiction under RLUIPA is based on the spending clause,

RLUIPA does not authorize a claim for money damages against prison officials sued in their

individual capacities. Rendelman, 569 F.3d at 187 - 89. The court in that case recognized that

Congress had the right to enact RLUIPA under the spending clause to control the actions of state

and local entities and officials who receive federal funding. In addition, RLUIPA itself allows

Congress to act when the actions at issue affect interstate commerce. Rendelman, 569 F.3d at 187

- 89. When Congress desires to impose a condition under the spending clause, "it is Congress'

burden to 'affirmatively impos[e] [the] 'condition in clear and unmistakable statutory terms.'" Id.

at 189, quoting Virginia Dep't of Education v. Riley, 106 F.3d 559, 563 (4th Cir. 1997) (en

banc). The court reasoned that "in simply defining 'government' in § 2000cc-2 to include a

'person acting under color of State law,' Congress did not signal with sufficient clarity and intent

to subject such a person to an individual capacity damages claims under RLUIPA.'" Id. at 189,

citing Pennhurst State Sch. & Hosp. v. Halderman, 451 U.S. 1, 17 (1981). Therefore,

Muhammad cannot rely on RLUIPA's spending clause basis to pursue a claim for damages

against defendants in their individual capacities. Since Muhammad makes no allegation that

defendants' actions affected interstate commerce, it must be assumed that RLUIPA applies to

them based solely on receipt of federal funds. Brown v. Ray, 695 F.Supp. 2d 292 (W.D.Va.

2010). Thus, monetary damages against defendants in their individual capacities are unavailable to Muhammad in this action.

Since Muhammad can state no claim against defendants for either injunctive relief or monetary damages under RLUIPA, amendment of the complaint to assert a violation of Muhammad's rights under RLUIPA would be futile. That being the case, the reference to RLUIPA in Muhammad's reply to defendants' motions to dismiss, construed as a motion to amend the complaint, appropriately must be denied. Johnson, 785 F.2d at 509.

## V. Conclusion

Accordingly, the defendants' Motions to Dismiss will be granted.[2] An appropriate Order shall issue.

Entered this _2nd_ day of _March_ 2011.

Alexandria, Virginia

_____/s/_____
Gerald Bruce Lee
United States District Judge

---

[2] Because defendants prevail on the merits, the Court declines to address any issues of qualified immunity. See Wilson v. Layne, 526 U.S. 603, 609 (1999) (establishing two-prong qualified immunity test, where courts must first determine whether the plaintiff alleged an actual constitutional deprivation).